324-0165 Wood River, LLC, Appalee v. SFA Holdings, Inc., formerly known as Sachs, Inc., Appellant. Mr. Andrzejczyk, if you're ready, you may proceed. Thank you. May it please the Court. My name is Bill Andrzejczyk on behalf of SFA Holdings, Inc., formerly known as Sachs, Inc., the Appellant. This case began as a claim for breach of a commercial lease guarantee and a claim for rental damages payable to a landlord owner. Now, that landlord owner has been made whole to the tune of $8 million, and that is $8 million that the trial court did not credit in any way. And that was done via a two-step transaction, and I'd like to begin by discussing that transaction because that's the crux of this appeal and is intertwined with the two largest issues before the court. Counsel, you say made whole. The fact that they don't have a property anymore is how they were made whole? GMAC, the former landlord, chose to sell the property and recover money for that property. That was their choice. And the timing of the choice, the amount that they sold it for, was all their choice to do it that way, yes. Please continue. So this transaction is something that Wood River wants to desperately ignore. It wanted the trial court to ignore it when it obscured the nature of its assignment at the first substitution hearing. It wanted Sachs to ignore it when it withheld key facts during discovery, and Sachs had to file a motion to compel to get those produced. And now it wants this court to ignore the transaction by claiming waiver or surprise and asking that the court not reach the merits of this claim. But as explained in the briefs, there was no surprise here, at least not to Wood River. It was Wood River and the former landlord, GMAC, that unilaterally altered this relationship. And they did it with a transaction, and I'm calling it a single transaction because this took place within a matter of three days, where the landlord owner received $4 million for its rental damages claim and another $4.5 million that Your Honor noted for the property itself. And this landlord owner did all of this outside of the court's presence and did all of this unilaterally. And that, it did it all without Sachs' knowledge or without Sachs' consent, and those facts are all important because those are the facts that the very few cases we have to go off of, those are the things that the courts look at. And it did so unlawfully. This is unlawful because it is the policy of this state that if an obligee changes the guarantor's risk or the business relationship, they lose the benefit of the guarantee. So now you have... How does the sale of the property do either of those things? So the sale of the property, the assignment to Wood River and the splitting of the lease is what changed the business relationship and increased the risk. It was not necessarily just the half that was the sale of the property. It was the splitting of the guarantee and selling off to Wood River separate from the lease. And it does that in two ways to answer Your Honor's question. The cases, as Your Honors know, look at the business relationship with the parties. This was a business relationship where Sachs guaranteed rental payments to a commercial landlord. That was a landlord who owned the property. That was a landlord who had an interest in seeing that property succeed. And that landlord had a statutory, a contractual, and a common law duty to mitigate damages. And it was motivated to get the highest possible return if it were selling or leasing that property at any point. That is the relationship that Sachs entered into. Selling or leasing the property, counsel. Certainly they had an obligation to get the highest they could to lease the property. But where do we get to the selling of the property? And if I misspoke and said that it was an obligation, they were motivated to get the highest possible return. They were the owner of that land. And so at the time when they owned the land, they were motivated to get the highest possible money. That's who Sachs entered into. Well, motivated and a duty to mitigate are different though, aren't they? They are. They are. Absolutely. And so I'm describing the commercial relationship, which is a factor that the McGinley and the Southern Wine Courts look at. And so this was a business relationship in commercial real estate. That's what Sachs signed up for. GMAC and Wood River unilaterally altered that relationship. They put the guarantee in the hands not of a commercial landlord, not of the property owner, but of a speculative LLC who simply wanted to buy litigation. They had none of the duties, none of the motivations, none of the abilities of a commercial landlord. And Wood River did not care what money came in for the sale of the property. It does not matter to Wood River. So that drastically altered the business relationship. It also altered the risk, which is another factor that courts look at. And it increased the risk that the landlord owner would not mitigate its damages. That's something we argued at summary judgment. But it also actually increased the damages to Sachs. And here's how. Had the property stayed with GMAC through the term, Sachs damages would have been reduced. And that's the Jones case that we cite in our opening brief at page 23. But the structure of this transaction reduced the sale proceeds to $4.5 million, but kept Sachs exposure at 100%. So the risk increased. Not just the risk, but the actual increased because the landlord was able to, and Wood River's sole witness at trial admitted on page 680 of the record at lines 9 through 12, that Wood River's role in this transaction made it easier for GMAC to sell the property. And that's exactly what GMAC did. Mr. Andrzejewski, let me ask you a question. Assuming for the sake of analysis that you're correct, the analysis you're asking us to engage in applies to assignments of guarantees. But there's another aspect to this, and it is essentially the selling of a claim or the assignment of a claim, right? That's different than the assignment of a guarantee. And that analysis doesn't apply to the assignment of claims, does it? So I would like to look at the assignment of claims, and I'm glad you asked that, because the chosen action, that's Wood River's alternate theory, because they don't want the court to look at all of the rules in favor of guarantors and against guarantees being assigned. But the chosen action follows the legal claim. It does not follow a piece of paper. And so what Wood River bought here was a summary judgment on liability that was granted in favor of a landlord that owned the property and was present in the case. Now, that was an interlocutory order. It was always subject to revision by the trial court and subject to appeal here. But it was granted to a landlord that held both the lease and the guarantee. And when the prior judge made that ruling that Sachs was liable to GMAC, it was the landlord at the time. And then Wood River and GMAC tore those papers apart, the lease and the guarantee, and put them in hands of different parties. And then Wood River filed a fresh complaint, a fourth amended complaint, which supersedes all prior complaints and stands on its own right. And so the complaint that started this case and on which summary judgment was granted no longer exists. The party is no longer in the case. And the premise on which summary judgment was granted, a lease and a guarantee in the hands of the same person, also no longer exists. So Wood River did get an action assigned, but it must establish its claims in its own right and cannot do so because it is not permitted to recover under this guarantee in the first instance. As a last ditch effort on all of this, Wood River likes to call Sachs theory a windfall and that it would be a windfall to Sachs to nullify the assignment of the guarantee. But that ignores the public policy of Illinois and the jurisprudence behind it. And this court would be giving effect to that gambit that Wood River has tried here to the detriment of guarantors across the state. The landlord owner was made whole here. And if there's a finding of no liability, it is true that Wood River would not recover. But Wood River is a stranger to this initial transaction. They're a stranger to the property. They are a speculator that speculated they could make a quick profit purchasing this claim. And so the court must choose whether Wood River is entitled to take this guarantee, separate it from the only other piece of paper and property that give it value and treat it as commercial paper or a bond. But that would be the change the law in Illinois. And that would be to change the protections on which guarantors rely. And to the extent the court is inclined to make that change, I submit that that should be done prospectively, not retrospectively. And respectfully, that is something that should be done by the legislature, not by this court at Wood River's urging. Another argument Wood River raises with respect to the sale proceeds, which is the second aspect of this transaction, is that you need to put the parties, the non-breaching party in a position as if all parties had fully performed. And that's generally a correct statement of the law. And for Wood River, that means full rental payments from the tenant or sacks all the way through the end of the lease, and then the ability to sell the property free and clear from that date. But that ignores the reality of real estate. The landlord owner here could have sold the property at any time. They would have had to do so subject to the lease, but the landlord would still have the value of the land when selling. And they could have sold it before Carsons went bankrupt, immediately after, or waited until after the lease expired. And that's why the cases relied on, even by the trial court, talk about how the sale price of land takes into account future rental value. The market sets that value. But it's always future rental value, not past rent owed. Correct. And that's where Wood River runs into a problem, and the trial court runs into a problem with some of its math. Because it's trying to say that this 4.5 million accounts for future rental damages or post-sale rental damages. And that simply can't be the case. That's inconsistent with the court's finding that there were zero rental damages for the property. But it's also inconsistent with the same math that Wood River is using to calculate the rent. In our reply brief on page 9, we point out the fact that if the 4.5 million were truly a measure of post-sale damages, rental damages, they're over two and a half times what was owed under the lease at that point. So it may not be a full four and a half that SACS is owed as a discount off of this judgment. It may only be that two million. But the trial court ignored it, and it was error to completely ignore that. And the other problem with Wood River's hypothetical is that they are seeking both the full rental value and a sale as an ability for the landlord. But they actively prevented that from happening. They partnered with GMAC to get the property sold during the lease term. And they still want the benefit as if they hadn't taken those actions. So in other words, Wood River wants the full amount of rent from SACS and GMAC to pocket money for its claim and GMAC to pocket money for the sale. And that's a hypothetical that is preferring fiction over what actually happened in the case. There was no guarantee, no pun intended, that GMAC would have been able to sell the property at any point, a different point in time, or for the same amount. And the trial court did not consider that, nor could it, because Wood River did not put on any evidence of that. With my remaining two minutes, I'd like to briefly address the operating expenses issue with respect to the ledgers and the business records exception. Admittedly, this involves some factual questions that are not often overturned on appeal. But if there is a situation to overturn, this is the one. What Wood River has done is not given the court the invoices, not given the court either of the two witnesses that could have explained the ledgers, but took printouts from a system, printed them for the purpose of litigation, and is relying on the fact that the court let those in as exhibits to say that this court must rotely apply the summary number at the bottom of those documents and ignore the testimony. Wood River had the wrong witness who did not create the ledgers, did not create their entries, did not supervise the entries, and did not even know who, the when, or what of some of the entries. This is not simply he was not standing next to the accountant. He didn't even know who he should be standing next to or when to stand next to them. So it is Wood River's burden to put in evidence of all of its damages. It failed in that burden. And simply because the documents are in evidence does not prove anything with respect to those numbers in those documents. Thank you. Justice Hedl or Justice Davenport, any questions? No. Nothing further. Mr. Andrzejczyk, you'll have an opportunity in reply. Mr. Hausman. Thank you, Your Honor, and good afternoon. May it please the court. My name is Brian Hausman, and I represent the plaintiff, Appley, Wood River, LLC. With me on the Zoom today is representative of Wood River, Matthew Blumenstein. Your Honor, this is a straightforward case. Saks is a delinquent guarantor, and it's here looking for any excuse not to pay on the guarantee. There are many reasons why the circuit court should be affirmed. But as the court carefully articulated in its 18-page decision, which took place significantly after a bench trial, you didn't hear Mr. Andrzejczyk say the word trial today. But we had a trial on all of the defenses that are raised, some for the first time at trial. But we had a trial on all of these defenses, and the circuit court issued a thoughtful decision. And that decision should be affirmed. That is so for many, many reasons, but I think three are really important for today. First, Saks' argument that its risk was increased by the substitution of Wood River into the case is defeated by simple math. And that is so because Wood River was entitled to and did recover precisely that which GMAC would have recovered but for the assignment. Not a penny more and not a penny less. To put it another way, it's absolutely the case that if I were here today on behalf of GMAC, Wood River's predecessor, I would be defending a judgment in the precise amount that this court issued. It would not change by a penny. And so as a result, there was no increase in Saks' risk here in any way, shape or form. Secondly, to a point that your honors asked about of Mr. Andrzejczyk, Saks' argument about the language of the guarantee and about separating the lease and the guarantee and about whether the guarantee could be assigned is a red herring. It did not matter whether Wood River received an assignment of the guarantee itself. And that is because under controlling law to which Mr. Andrzejczyk makes no response, Wood River did not need to receive an assignment of the guarantee where it received an assignment of the litigation claims. Mr. Andrzejczyk argues today that it would change the law in Illinois to make it such that a party could recover on a contract claim or a guarantee claim as an assignee of a legal claim. But the opposite is true. The Ginsburg case, the Stern case, there's a whole line of cases saying that even where a guarantee expressly prohibits the assignment of the guarantee, a claim on the guarantee is assignable. That procedure, which Mr. Andrzejczyk talked a little bit about in terms that I don't frankly understand, is not a change in Illinois law. It's expressly set out in Section 403 of the Code of Civil Procedure. That provision provides, it's titled, who may be the plaintiff dash assignments dash subrogation. And subsection A of that provision provides that the assignee and owner of a non-negotiable chosen action may sue thereon in his or her own name. That's precisely what took place here. And Mr. Andrzejczyk has no answer for it. So the court need not even get into this bit about the language of the guarantee, etc. It expressly permitted an assignment of the guarantee itself as well. But the court need not even reach that. Third, even though Sachs waived all affirmative defenses in this particular guarantee, a point that was made recently by the Seventh Circuit in a related case against Sachs on another Carson's lease guarantee, even though that's the case in this case, the circuit court permitted Sachs to raise its defenses at trial. And yet Sachs does not contest the circuit court's factual findings here. The circuit court made two critical factual findings. They're not against the manifest way to the evidence. And Sachs frankly concedes them. The first is that the transfer. Mr. Andrzejczyk talked about motivations and who was motivated to do what. The circuit court expressly found that the transfer of the claim from GMAC to Wood River did not change Sachs's risk at all, that there was no material change in anyone's conduct as the result of that transfer. GMAC continued through its broker who testified at trial, continued its efforts to mitigate damages, and the court found no change. Likewise, we had a trial that was ostensibly about Sachs's only affirmative defense, which was an alleged failure to mitigate. The circuit court found that the owner of the property acted at all times, both before and after the assignment to mitigate damages in a commercially reasonable way. That finding is not contested here today. Those main arguments go primarily to the standing defense that Mr. Andrzejczyk now raises and to the material risk defense, which was raised at summary judgment in the circuit court and which the circuit court permitted Sachs to put on evidence about. There was no real evidence on that point, but the court permitted it. But Mr. Andrzejczyk talked perhaps today most about a different argument, which is what I'll call the offset argument. That argument, as I understand it, is that that the court should have reduced the damages that Wood River was able to recover by the amount of the sale price for the property. That argument fails for a number of reasons, not the least of which is that, again, the guarantee waives that defense expressly. Secondly, it was forfeited. That argument was raised for the first time at trial in this case. Regardless, regardless on the merits, there is nothing to offset. And in order to get there, the court just has to accept a simple hypothetical. Let's assume for the moment that GMAC never assigned the guarantee claims to Wood River and and I were here on behalf of GMAC. GMAC would be entitled to every cent of the lost rent damages up to the date of the sale. And then under the circuit court's holding, it would not be entitled to future loss rent damages. That was something that, quite frankly, we disagreed with the circuit court on below. We've not we've not raised a cross appeal on that issue. But regardless, the circuit court cuts off damages at the date of the sale. So then then we have to ask the following question. In September of twenty twenty two, GMAC sells the land for approximately four point three million dollars. And the question now becomes if Sachs had performed on its guarantee obligations and paid all of the rent up to the date of the sale, would GMAC now have to give back the four million dollars it obtained for selling its land to its defaulted guarantor or its tenant? No, there's there's there's no relationship between those two items at most. At most, the purchaser of the land was paying for the right to rent it in the future, but it wasn't paying for any past due rent. That's both true as a matter of fact, and it's true as a matter of logic. There simply is no case in the history of jurisprudence that I'm aware of, including the Jones case and any other case cited by Sachs, in which a defaulting tenant or its guarantor is entitled to a credit for the sale of the land. I liken this in the circuit court and I like this analogy to to the bundle of sticks metaphor that was used in my property class in law school. The owner of a property, GMAC in this case, had the right, had multiple sticks in its bundle of rights with respect to the property. One of those was to sell its land, but the sale of the land did nothing to credit GMAC for the value of the lost rent that it should have been paid up to the date of that sale. And for the same reason, because Wood River merely steps into GMAC's shoes, there's no reason to reduce the damages by any amount for that sale. And Sachs certainly makes no effort and made no effort in the circuit court to articulate which portion of that $4 million was for past rent. And that's for good reason, because it was none of it. It was none of it. In fact, the developer, the uncontested testimony at trial in this case, is that the developer is tearing down the building and building a new development in its place. So even as concerns the future, there was no value paid for lost rent damages. And this particular purchaser took no interest. This was expressed, and we've cited this in our brief, expressly in the purchase agreement. It took no interest in the lease or in the guarantee or in the litigation. That interest, as your honors knows, had been transferred already to Wood River. Can I ask a question, Mr. Hausman? Absolutely. I want to look at the other side of this coin, just out of curiosity. So they've separated the ownership of the property and the right to recover for lost rent, but there persists a duty to mitigate, correct? That was the circuit court's holding, yes. So you disagree with that holding? Well, the Seventh Circuit, I think, correctly pointed out that this guarantee waives defenses like mitigation. But setting that aside, your honor, yes, that's correct. It strikes me as odd to, okay, set aside the guarantees language, but it strikes me as odd to say that GMAC would have a continuing obligation to mitigate. And that obligation somehow is related to Wood River's assigned guarantee. But Wood River has no control over what GMAC does or doesn't do. And I guess what I'm asking is, if there is a relationship, why isn't there also a relationship when it comes to GMAC turning around and selling the property? Well, a couple of things about that, your honor. First, I think the correct way to look at the mitigation question, assuming mitigation exists as a defense, is that it serves in Illinois to reduce the damages that are recoverable. And that's why I said there was no change in the risk, because if SACS had been able to establish that trial, it wasn't. But if it had been able to establish that trial that there was a failure to mitigate, then it would have reduced Wood River's damages to the same extent as it should have reduced GMAC's damages, but for the assignment. But those were lost rent damages. In reality, there was a lot of argument in the circuit court regarding whether there was even an obligation to sell the property. In the circuit court, SACS argued for the first time really at trial that the obligation was not just to release the property, but that mitigation also encompassed an obligation on the part of the owner to sell the property. The circuit court disagreed with that. It found no such obligation. But nonetheless, it also held that GMAC took reasonable steps in an effort to try to sell the property. And so to the extent that was its obligation, I don't think a property owner has to sell its land in order to recover from a defaulting tenant. But even if it did, this court found that GMAC took reasonable steps to attempt to sell the property and that it sold it at an appropriate time at an appropriate value. And that finding is not challenged by SACS. So whatever whatever the scope of that obligation, I think the court can can be comforted that the circuit court's finding is not against the manifest way of the evidence in terms of the actual on the ground efforts. And SACS doesn't even challenge that ruling. So we should not suffer any reduction as the result of the transaction that Mr. talked about because the reality on the ground never changed. And in fact, it never could have changed because, again, Wood River would only recover what its signer would have been permitted to recover. That's that's black letter law. And therefore, and it distinguishes this case from all of the material risk cases, including the Southern Wine case, which is the only case that ever found a change in material risk. In that case, unlike here, the amount of the debtor's obligation and therefore the amount of the guarantor's obligation changed significantly as the result of a transaction. Here, there was zero change. SACS merely has to make the check out to a different entity, but the amount of that check is precisely what it would have been if GMAC were still in the case. And SACS concedes in its briefing and today that GMAC was entitled to recover here. So we should have no issue with any of those those matters. And with that, thank you, Your Honors. I appreciate your time. Justice Hedl or Justice Davenport, any additional questions? I do. Go ahead, Justice Davenport. Mr. Hausman, you want to address the issue of the prejudgment interest? Absolutely, Your Honor. Essentially, what we have is a difference of opinion on the nature of the contract and the interpretation of the contract. This contract permits, quote, maximum the maximum amount of interest permitted under applicable state law. Our interpretation of maximum and the circuit court's interpretation of maximum is that that means 9 percent unless under Section 4 of the Interest Act, unless there is an exception that permits a higher rate. The interpretation that Mr. Andercheck and SACS argue for is one that we believe would read that term maximum out of the contract or would replace it with the term minimum effectively. Section 2 of the Interest Act, of course, says that if there is no there are no words in the agreement that go to prejudgment interest, then we apply a rate of 5 percent. So in order to apply that same rate here, we would have to determine that maximum amount of interest permitted under applicable state law is either meaningless or it means the minimum, which is 5 percent. And I think that's the incorrect interpretation. And the appellate court in McGinley agreed that the term maximum means 9 percent unless there's an exception that permits a higher stipulated rate. Thank you. My question was, how was Olson the appropriate witness to testify to the business records? Thank you, Your Honor, and I apologize. I didn't reach that issue. So I thank you for giving me the opportunity. So two issues, I think, on the business records. First of all, this this is these are textbook business records. There were four exhibits that were admitted. They are they are general ledgers for the property. And to your question, Justice Heidel, excuse me, Olson was the perfect witness to testify to this. He was the property manager. He testified that he was the one who was responsible for authorizing the expenses. And he certainly testified to the foundation that was necessary to admit these as business records. Recall that this is here on a question of whether the circuit court abused its discretion in admitting the four exhibits. Three of the four were never objected to. And the court had every reason to admit the fourth. Mr. Mr. Olson testified that it was made at or near the time by someone with knowledge. He testified that he was familiar with the accounting department, which was responsible for inputting those numbers into the ledgers. And he testified as well. He provided extensive testimony about the nature of the expenses, what steps that he took to to make sure that those expenses were kept down. He talked about the specific types of expenses and he said that he was the one that was authorized to to make those expenses. And he said these exhibits reflected those expenses. So here there this was really a textbook example of a business record. And there really is no reason to call that into question. There's no speculation. There's no exhibits to the contrary. The best that Mr. Andercheck can say is that we don't have the underlying invoices and we don't have, you know, the gardener and the person who did maintenance on the HVAC system to testify. But that's precisely why courts admit business records like this that are compilations of expenses, because that would be too much of a burden to any plaintiff. And so for that reason, I would say we can be very comfortable relying on Mr. Olson. Thank you, Mr. Hausman. Thank you. Thank you, Mr. Hausman. Mr. Andercheck, you may argue and reply. Thank you. So what Mr. Hausman said, this was a straightforward case. This was a straightforward case when GMAC was involved and even when CR Center was involved. But you also heard Mr. Hausman talk a lot about ifs and a lot of hypotheticals. And if GMAC were here and if I were representing GMAC, well, GMAC is not here. And that's the whole point. GMAC and Wood River made sure that GMAC was not here. And so Wood River likes to claim at certain points in time that they are standing in GMA shoes, but they don't want to stand in GMA shoes when it's shown that those shoes have eight million dollars in them. And they don't want to stand in those shoes when it's shown that by Wood River's own analysis, GMAC received rental damages as well as property damages. Wood River asks the court to look only at the chosen action and gives the court a 97 year old case, a 103 year old case and a 40 year old case from Maine that no other court in Illinois has cited beyond the trial court here. And Wood River notably went back 103 years and still could not give this court any case that permits it to do what it did here, which is to separate the claims, separate the paper from the property and claim on just the piece of paper. And whether they're claiming breach of guarantee, which, by the way, is the claim they brought in this court, that's the name of count one, or whether they're trying to call it now a chosen action because they don't want to satisfy the elements of their breach of contract claims. They are the plaintiff and they had the burden throughout. They had the burden to put on competent evidence. They had the burden to put on at least a summary or ledger that was created in the ordinary purpose and not created purely for litigation. And in which the witness admitted would change if you ran it at a date off schedule. And they had the burden here throughout and throughout trial. Now, the trial that Mr. Houseman raised is what makes this different from all those chosen action cases. Those cases involved Ginsburg, Snyder, etc. Those cases involved a set amount that had already been determined, sometimes by a bankruptcy court judge, sometimes by agreement of the parties. We did not have a set amount here. That's why we had a full trial exclusively on damages. And Mr. Houseman likes to talk about a few of the fact findings that were made and claims that SACS is not challenging those. As the court knows, those are in SACS's briefs and have been challenged here. And it is not exclusively that one stick away from the bundle mitigation that courts look at. Courts look at the relationship between the parties, which I already explained in my opening, how that was changed. And courts look at the risk. And the risk here, there was a mitigation risk. There was also a sale risk. And I did not hear Mr. Houseman respond to the fact that the only Wood River employee called that trial admitted that Wood River made it easier for GMAC to sell the property. They made it easier. But Mr. Andrzejewski, do you concede that if there had never been an assignment to Wood River, GMAC could have sold that property and there would have been no offset for SACS? It depends on this. I cannot concede that in absolute, which Wood River wants to talk about absolutes, but I have to look at the facts here. It would depend on what Wood River recovered and the circumstances of the sale. I'm taking Wood River out of the equation. I'm just asking, let's assume there was never an assignment and we're just talking about GMAC. If GMAC sells the property, SACS is not entitled to an offset. Is that correct? The Jones case says that if a landlord sells the property as a form of mitigation and recovers more than their damages, then the excess cannot be tied against the defaulting lessee. So it would depend on the sale of the property. And I repeat here that we're forced into this hypothetical because of Wood River and GMAC and what they did here. Mr. Hausman talked about a bundle of sticks and once again, Wood River is trying to separate that out, claiming that, well, this payment is for sure only for the property and this payment is for sure for pre-sale rent and this is for post-sale rent. But there was no evidence put before the court and the court did not consider any of that. I see my time is up unless your honors have any additional questions. I thank you for your time. Justice Hedl or Justice Davenport, anything? Just to check that it was Jones versus, is it Hrine? That's how I'm pronouncing it, yes, your honor. Yes, my best. Thank you. Nothing. All right. The court thanks both sides for spirited argument. We will take the matter under advisement and render a decision in due course.